C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

C. D. SPANGLER CONSTRUCTION COMPANY v. INDUSTRIAL CRANKSHAFT
AND ENGINEERING CO., INC., D/B/A DYNATECH INDUSTRIES; DURHAM
LIFE INSURANCE COMPANY; INTERNATIONAL INSURANCE COMPANY;
AETNA FIRE UNDERWRITERS INSURANCE COMPANY; WESTCHESTER
FIRE INSURANCE COMPANY; GREAT AMERICAN INSURANCE COM-
PANY; FEDERAL INSURANCE COMPANY; ST. PAUL FIRE AND MARINE
INSURANCE COMPANY; UNITED STATES FIRE INSURANCE COMPANY;
AMERICAN STATES INSURANCE COMPANY; AND TRAVELERS INDEM-
NITY COMPANY

No. 128PA88

(Filed 7 February 1990)

1. **Insurance § 6.2 (NCI3d)— policy provisions extending cover-
age—construction favoring coverage**

So long as it is reasonable to do so, insurance policy provi-
sions which extend coverage are construed liberally in favor
of coverage.

**Am Jur 2d, Insurance §§ 283, 284.**

2. **Insurance § 149 (NCI3d)— general liability insurance—contam-
ination of natural resources—property damage**

The State's interest in protecting its natural resources
is a form of property right, and the contamination of the State's
resources such as groundwater and soil is "property damage"
within the meaning of the coverage clauses of a standard com-
prehensive general liability policy.

**Am Jur 2d, Insurance § 711.**

3. **Insurance § 149 (NCI3d)— general liability insurance—envi-
ronmental cleanup costs as damages**

Expenditures incurred by an insured in complying with
lawful orders of a State agency to remove hazardous waste
from its premises are "damages" which the insured was legally
obligated to pay because of property damage within the mean-
ing of coverage clauses of a comprehensive general liability
insurance policy. The term "damages" is not being used in
its legal and technical sense in the policy and is susceptible
to more than one definition. Therefore, the appellate court
must employ the interpretation which favors the insured, and
a reasonable person in the position of the insured may have

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

understood that the term "damages" included state-ordered environmental cleanup costs.

**Am Jur 2d, Insurance § 711.**

4. **Insurance § 149 (NCI3d) — general liability insurance — hazardous waste — removal order by State agency — insurer's duty to defend**

Compliance orders issued by a State agency requiring an insured to remove hazardous waste from its premises are "suits" giving rise to the insurer's duty to defend under a comprehensive general liability policy.

**Am Jur 2d, Insurance § 711.**

Justice MITCHELL did not participate in the consideration or decision of this case.

APPEAL by C.D. Spangler Construction Company (Spangler) and Durham Life Insurance Company (Durham Life) pursuant to N.C.G.S. § 7A-27(b) from an Order and Judgment entered by *Snepp, J.,* at the 4 January 1988 Session of Superior Court, MECKLENBURG County, granting St. Paul Fire and Marine Insurance Company's (St. Paul) Motion for Partial Summary Judgment and The Travelers Indemnity Company's (Travelers) Motion for Summary Judgment. St. Paul's and Travelers' motions to bypass the Court of Appeals were allowed pursuant to N.C.G.S. § 7A-31(b). Heard in the Supreme Court on 13 October 1988.

*Perry, Patrick, Farmer & Michaux, P.A., by Roy H. Michaux, for plaintiff appellant.*

*Young, Moore, Henderson & Alvis, P.A., by Walter E. Brock, Jr., for defendant appellant Durham Life Insurance Company.*

*Golding, Crews & Meekins, by Harvey L. Cosper, Jr.; Steptoe & Johnson, by Roger E. Warin, for defendant appellee St. Paul Fire and Marine Insurance Company.*

*Womble, Carlyle, Sandridge & Rice, by Richard T. Rice and Reid C. Adams, Jr., for defendant appellee The Travelers Indemnity Company.*

*Manning, Fulton & Skinner, by Howard E. Manning, Sr., and Covington & Burling, by Eric S. Koenig, for amici curiae American Petroleum Institute, ICI Americas, Inc., International Business Machines Corporation and Olin Corporation.*

*Bode, Call & Green, by S. Todd Hemphill, for amicus curiae Insurance Environmental Litigation Association.*

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

EXUM, Chief Justice.

This is an action for declaratory judgment brought by the insured seeking judicial construction of comprehensive general liability insurance policies. The question presented is whether the policies' coverage clauses protect the insured against losses incurred in complying with lawful orders of a state agency to remove a certain hazardous waste from its premises. The trial court concluded the coverage clauses did not protect against such losses and entered summary judgment for St. Paul and Travelers. We conclude to the contrary and reverse.

I.

The record before the trial court shows the material undisputed facts to be as follows:

Spangler is a North Carolina construction company organized with its principal place of business in Mecklenburg County. On 14 April 1967 Spangler leased for twenty years a site on Hawkins Street in Charlotte from a predecessor to Durham Life, which currently owns the property. In May 1973 Spangler sublet a portion of the premises to Industrial Crankshaft and Engineering Company, Inc., d/b/a Dynatech Industries (Dynatech), which conducted a chromium plating operation at the site.

On 29 July 1974 a fire on the subleased premises destroyed much of Dynatech's equipment including its chrome tanks. The tanks' contents, 625 gallons of liquid solution containing 1,150 pounds of chromic acid, were washed by city firefighters into the yard and into a large open pit located inside the building.[1]

In December 1984 the Mecklenburg County Environmental Health Department informed a representative of the North Carolina Department of Human Resources, Solid and Hazardous Waste Management Branch (the State) of the presence at the Hawkins Street site of hazardous waste containing chromium in amounts exceeding legal limits. See 40 C.F.R. § 261 (adopted by reference at N.C. Admin. Code tit. 10, r. 10F.0029). The State also concluded that discharge of such waste is a prohibited disposal under 40 C.F.R. § 270.1(b) (adopted by reference at N.C. Admin. Code tit. 10, r. 10F.0034(a)(1) ). The State informed Dynatech of its obligation

1. Spangler was first advised as to the occurrence and details of the fire in April or May of 1985.

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

under the North Carolina Solid Waste Management Act (the Act), N.C.G.S. § 130A-290, et seq., to develop and execute a remedial plan to clean up the waste material pursuant to 40 C.F.R. § 265.15(c) (adopted by reference at N.C. Admin. Code tit. 10, r. 10F.0033(b) ).[2] Dynatech conducted tests to determine the extent of the contamination and began removing contaminated soil from the site in June 1985. It then vacated the site some time before 30 June 1985.

On 5 July 1985 pursuant to the Act, the State issued a Compliance Order addressed to Spangler, Durham Life, and Dynatech. The order required Dynatech and Spangler to perform a number of cleanup actions to bring the site into compliance with state regulations. By letter dated 11 September 1985, Spangler notified its insurer St. Paul of the order and demanded protection from losses or costs which might be incurred by Spangler in the cleanup.[3]

By October 1985 Spangler had employed Chas. T. Main, Inc., an engineering firm, to study the problem and to recommend reasonable remedial action. One of the firm's environmental engineers conducted tests and determined that the groundwater at the site had been contaminated. There were complaints that the contaminated water was getting into storm drains and appearing off the site.

On 27 March 1986 the State issued a second Compliance Order which superseded its July 1985 order. The new order required action by Durham Life in addition to Spangler and Dynatech. In this order, the State concluded: chromium levels at the Hawkins Street site exceeded state limits; spills or other leaching had occurred at the site; "discharge" from the site had continued to the present; and there was a potential for groundwater contamination. The State found that Spangler, Durham Life, and Dynatech, having failed to control or treat spills of hazardous wastes, were operating an unpermitted hazardous waste disposal facility in violation of state and federal regulations. The State directed Spangler, Dynatech, and Durham Life to perform a sequence of enumerated actions to bring the site in compliance with these regulations. They were

---

2. On this appeal, we are not asked to resolve any questions about the accuracy of the State's environmental analysis or the appropriateness of its orders. Consequently, we assume the State's interpretation and application of the administrative regulations were proper.

3. St. Paul responded in a letter dated 3 January 1986 which notified Spangler that it was investigating the circumstances underlying Spangler's claims.

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

ordered to: control run-on and run-off from the active portion of the site; dispose of or decontaminate all equipment and structures on the site; submit a closure plan and complete closure of the site within 180 days of its approval; and collect and analyze soil and groundwater samples for waste content. The order informed the parties of their right to request a formal hearing under the Administrative Procedure Act, 1973 N.C. Sess. Laws ch. 1331 (recodified at N.C.G.S. § 150B (1987)). Though Spangler subsequently petitioned for a hearing, nothing in the record indicates that one was held.

After Spangler had evaluated the investigative report from its engineers, the State advised it to remove the contaminated portion of the building and the soil and haul it to a hazardous waste landfill in Pinewood, South Carolina, to avoid damage to the surrounding properties. By letter dated 30 July 1986 Spangler again notified its insurer, St. Paul, of the State's demands. The letter set out in detail the extent of hazardous waste contamination at the site, the remedial requirements imposed by the State's two compliance orders, and the costs of cleanup to date.[4] In October 1986 St. Paul responded, denying it had any obligation to Spangler. Spangler proceeded with the cleanup of the site.

In July of 1987, the State directed Spangler to dig permanent wells designed to collect underground water at different levels in the same spot next to the adjoining property owned by Durham Life. The affidavit of Gary Ribblett, an environmental engineer employed by Chas. T. Main, Inc., indicated that chromium contaminated groundwater had migrated off the site area:

> From our analysis of the water samples removed from these wells, we have discovered chromium at highly concentrated levels which, in our opinion, will require some treatment system designed to recover the groundwater to prevent further migration off the site. The State has requested a meeting to discuss a specific course of action with regard to the water treatment.

---

4. This letter contained the following comments regarding the status of groundwater contamination at the Hawkins Street site:

> As a result of the findings by [Spangler's engineer] Charles T. Main, it has been determined that there are chromium deposits on the site and in the groundwater which exceed maximum limits. . . . If . . . steps are not taken, there is clear and eminent danger that surface water from the site may seep into the acquifer [sic] and cause contamination of other properties.

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

By 10 October 1987 Spangler had expended $507,143.72 in testing and analysis, attorney's fees, and other cleanup related expenses. By 9 February 1987 Durham Life reported incurring costs and expenses for engineering and attorney's fees totaling in excess of $10,000.

St. Paul provided comprehensive general liability insurance coverage to Durham Life from 1 April 1970 through 1 April 1985 and to Spangler from 1 November 1982 through 1 November 1985. Travelers provided similar coverage to Durham Life from 1 April 1985 to 1 July 1986. The pertinent insuring provisions of these policies contained language identical, or comparable, to the following:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as *damages* because of . . . *property damage* to which this insurance applies, caused by an occurrence . . . and the Company shall have the right and duty to defend any *suit* against the insured seeking *damages* on account of such . . . *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or *suit* as it deems expedient . . . .

(Emphasis added.)[5] The policies define the term "property damage" as:

---

5. This language was quoted from Durham Life's policies issued by St. Paul for annual policy periods from 1 April 1970 through 1 April 1980. Spangler's policy issued by St. Paul and Durham Life's policies issued by St. Paul for the annual policy periods 1 April 1980 through 1 April 1985 contain the following comparable language:

> Your general liability protection covers you and other persons protected under this agreement against claims for . . . damage to tangible property resulting from an accidental event. . . . We'll defend any suit brought against you for damages covered under this agreement, even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if that seems proper and wise.

Durham Life's policy issued by Travelers contains the following comparable language:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . .

None of the parties argue that the differing language in the policies affects the issues before the Court.

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

(1) *physical injury* to or destruction of *tangible property* which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(Emphasis added.)[6] None of the policies define the term "damages" or "suit."

On the basis of these insurance policies, Spangler filed on 1 December 1986 an action in Superior Court, Mecklenburg County, seeking a declaratory judgment that St. Paul was obligated to defend Spangler against and indemnify it for losses it incurred in cleaning up the premises pursuant to the State's compliance orders. Durham Life answered the complaint and sought successfully to join Travelers as an additional defendant. Durham Life also asserted cross-claims against St. Paul and Travelers for a declaratory judgment that these insurers were obligated to defend it against and indemnify it for such cleanup costs as it might incur pursuant to the State's compliance orders. St. Paul answered Spangler's and Durham Life's claims, denying that it owed any defense or indemnification. Travelers answered Durham Life's cross-claim, similarly denying that it had a duty to defend or indemnify Durham Life.

Both St. Paul and Travelers moved for summary judgment on the claims asserted against them by Spangler and Durham Life. On 4 January 1988 the trial court concluded that the coverage clauses provided no protection for losses incurred by Spangler and Durham Life, and it allowed both insurers' motions for summary judgment.[7] The trial court identified three grounds for its decision:

---

6. This language is quoted from Durham Life's policies issued by St. Paul for the annual policy periods 1 April 1977 through 1 April 1980. Identical language was used in Durham Life's policy issued by Travelers. Spangler's policy issued by St. Paul and Durham Life's policies issued by St. Paul for the annual policy periods of 1 April 1980 through 1 April 1985 contain no definition of "property damage." Durham Life's policies issued by St. Paul for. the annual policy periods of 1 April 1970 through 1 April 1976 defined "property damage" as "injury to or destruction of tangible property."

7. Because the trial court's decision was based solely on the coverage clauses, we do not consider whether any of the numerous exclusion clauses would preclude the claims.

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

1. The State's Compliance Orders issued to Spangler and Durham Life do not constitute "suits" within the terms of the liability coverage provisions of the insurance policies and that the moving insurers have no duty of defense under the insurance policies in connection with the Compliance Orders . . . ;

2. Any sums which Spangler or Durham Life may expend in conforming with the State's Compliance Orders do not constitute "damages" within the terms of the liability coverage provisions of the insurance policies . . . ; and

3. The State's Compliance Orders do not constitute suits seeking recovery of damages from Spangler or Durham Life for "property damage" within the terms of the liability coverage provisions of the policies . . . .

Spangler and Durham Life appealed to the Court of Appeals. On 6 May 1988 this Court allowed St. Paul's and Travelers' petitions for discretionary review prior to a determination by the Court of Appeals. Subsequently this Court allowed the motions of the Insurance Environmental Litigation Association (IELA) and a group consisting of the American Petroleum Institute, ICI Americas, Inc., International Business Machines Corporation, and Olin Corporation— (The American Petroleum Group)—for leave to appear as amici.

II.

Appellants Spangler and Durham Life ask us to reverse the trial court's entry of summary judgment. More specifically, they contend that as the pertinent terms are used in the policies' coverage provisions, (1) the injury done to the environment by the release of toxins was "property damage"; (2) the costs incurred in the cleanup are "damages" which the insured was legally obligated to pay because of "property damage"; and (3) administrative actions requiring cleanup of hazardous wastes are "suits" giving rise to the insurers' duty to defend. Appellees St. Paul and Travelers contend the conclusions of the trial court are correct and urge us to affirm. Because we agree with appellants' position, we reverse.[8]

---

8. At this point, we turn to St. Paul's motion to strike portions of the brief and exhibits of The American Petroleum Group, filed 1 July 1988. We reserved ruling on this motion until after the case was argued. St. Paul contends that the brief and attached exhibits address matters outside the record in violation of N.C.R. App. P. 9 and principles established in case law. The American Petroleum

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

A.

There is no real dispute among the parties regarding the facts or the language of the insurance policies. Their disagreement relates to the meaning and scope of the policies' basic coverage provisions. As we noted under similar circumstances in *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986), "[r]esolution of [an insurance policy's scope] involves construing the language of the coverage . . . and determining whether events as alleged in the pleadings and papers before the court are covered by the policies. As such, it is an appropriate subject for summary judgment." *See also Kessing v. Mortgage Corp.*, 278 N.C. 523, 535, 180 S.E.2d 823, 830 (1971).

We first addressed the question of an insurer's contractual duties regarding environmental contamination cleanup in *Waste Management of Carolinas, Inc.* There, the policies being construed contained essentially the same provisions as the ones now before us. *Waste Management of Carolinas, Inc.*, 315 N.C. at 693-94, 315 S.E.2d at 378-79. The trial court granted summary judgment for the insurers, ruling that they had no duty to defend. *Id.* We affirmed on appeal, holding that the insurers were under no obligation to defend the plaintiff, because under the facts alleged in the pleadings the policies' pollution exclusion clauses precluded coverage. *Id.* at 700, 315 S.E.2d at 383.

Because of the instant case's procedural posture and the manner in which it is presented on appeal, we are not called on to

Group responds that this nonrecord material, mainly involving the historical context and background of the term "damages" in the comprehensive general liability policy, directly addresses assertions of underwriting intent made by the insurers. We permitted St. Paul to address this issue at oral argument.

This Court has stated "[o]nly those pleadings and other materials that have been considered by the trial court for purposes of summary judgment and that appear in the record on appeal are subject to appellate review." *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 690, 340 S.E.2d 374, 377 (1986). *Accord Vassey v. Burch*, 301 N.C. 68, 74, 269 S.E.2d 137, 141 (1980). Both parties here concede that Exhibits 1, 12, 13, 14, 15, 16, and 17 of amici curiae American Petroleum's brief and references thereto at pages 4, 11, 11 n.6, 15, 33-38, 42-49, 52 n.35, 53, and 58 are nonrecord materials which were not before the trial court. We therefore grant St. Paul's motion to strike these portions of The American Petroleum Group's brief. We find it unnecessary to order The American Petroleum Group to submit redacted versions of its brief which eliminate all references to the nonrecord material and to allow St. Paul additional time to respond to the redacted version. We consequently deny St. Paul's motions requesting this relief.

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

construe any of the policies' exclusion clauses. Summary judgment was entered solely upon the trial court's construction of the policies' basic *coverage* provisions. The only question raised by the parties on appeal is the correctness of this construction. Consequently, we do not consider or comment on any potential application of the policies' exclusion clauses.

[1]   We turn first to several well-settled principles governing the construction of insurance policies. An insurance policy is a contract and its provisions govern the rights and duties of the parties thereto. *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986); *see, e.g., Powers v. Insurance Co.*, 186 N.C. 336, 337, 119 S.E. 481, 482 (1923). "As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued." *Woods v. Insurance Co.*, 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978); *see, e.g., Trust Co. v. Insurance Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 552 (1970). So long as it is reasonable to do so, policy provisions which extend coverage are construed liberally in favor of coverage. *State Capital Ins. Co. v. Nationwide Mutual Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986); *see, e.g., Waste Management of Carolinas, Inc.*, 315 N.C. at 693, 340 S.E.2d at 378. In *Woods v. Insurance Co.*, we summarized the general principles of construction applicable to disputed terms in an insurance policy:

> Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

*Woods*, 295 N.C. at 505-06, 246 S.E.2d at 777.

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

B.

[2] Bearing these principles in mind, we now apply them to the insurance policies being construed. In pertinent part the policies state that "[t]he [insurance] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage." As a threshold matter, we must decide whether "property damage" has occurred within the meaning of the policies, thereby potentially invoking their coverage provisions.

The appellant insureds contend that the trial court erred in ruling as a matter of law that the State's compliance orders do not constitute suits seeking recovery for "property damage" within the coverage of the insurance policies. They argue that the trial court's ruling is contradicted by the plain language of the policies and by a long line of decisions holding that remedial claims under federal and state environmental protection statutes are claims for "property damage" under standard comprehensive general liability policies.

Appellee insurers argue that the trial court properly determined they had no duty to defend or indemnify the insureds because any monies, including costs of cleanup or closure, that Durham Life and Spangler paid in complying with the State's orders are not sums which they had become legally obligated to pay because of "property damage." The insurers argue that the State's claim against the insureds may impose an economic cost, but that it does not constitute "property damage" within the meaning of the policies.

We hold that injury to the State's natural resources is "property damage."

We rely on the principles of insurance policy construction discussed in Part II-A. "Property damage" is defined in several of the policies. The following definition is included in the policy issued by Travelers and two of the policies issued by St. Paul:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

We use this definition to construe the meaning of "property damage" as that term is used in the pertinent policies.

In determining whether "property damage" has occurred under the policies, it is important to examine the circumstances surrounding the cleanup. The soil and groundwater at the site were contaminated. The insureds incurred the cost of cleaning up this contamination because of the compliance orders which the State entered pursuant to legislation enacted under its police power for the protection of natural resources such as water the purity of which is necessary for the health and safety of our citizens. In issuing the cleanup order, the State was acting in *parens patriae* to protect "quasi-sovereign interests such as health, comfort, and welfare of the people." Black's Law Dictionary 1003 (5th ed. 1979). *See also* 31 Words and Phrases 99 et seq. (1957) and supplement thereto.

The United States Supreme Court has held that discharge of pollutants into a state's soil, water and air injures a state's quasi-sovereign interests. In *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 51 L. Ed. 1038 (1907), the state of Georgia brought a suit to enjoin a company located in Tennessee from discharging pollutants into Georgia's environment. In discussing the nature of Georgia's interests, Mr. Justice Holmes said for the Court:

> This is a suit by a State for an injury to it in its capacity of *quasi*-sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.

(Emphasis in the original.) *Id.* at 237, 51 L. Ed. at 1044. *Cf. Missouri v. Illinois*, 180 U.S. 208, 45 L. Ed. 497 (1901). We agree with the *Tennessee Copper* analysis of the state's interests.

An Eighth Circuit panel has also relied on *Tennessee Copper* to determine that discharge of pollutants into the atmosphere caused "property damage" to governmental property interests. In *Continental Insurance Co. v. Northeastern Pharmaceutical and Chemical Co.*, 811 F.2d 1180 (8th Cir. 1987), *rev'd en banc on other grounds*, 842 F.2d 977 (8th Cir. 1988), the court stated:

> The [*Tennessee Copper* Court's] discussion of a governmental interest in "title" to all the soil, water, and air within its

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

jurisdiction suggests that the government has a property interest in natural resources. A similar implication arises from *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901), where the Court held that Missouri was permitted to sue as *parens patriae* to enjoin the discharge of sewage from Chicago, Illinois, into the Illinois and Mississippi rivers: "impairment of the health and prosperity of the town and cities of the state situated on the Mississippi river * * * would injuriously affect the entire state." 180 U.S. at 241, 21 S.Ct. at 844, 45 L.Ed. at 512. The Court suggested that although a dispute between states over interstate waters may not involve "direct property rights" of a state, the injury to the state's "quasi-sovereign" rights is akin to an injury to state property rights. *Id.* Furthermore, the Court stressed that in environmental damage suits, a state has the power to seek redress in court for the property damage caused to the general public. *Id.; see also Maryland v. Louisiana*, 451 U.S. 725, 766, 101 S.Ct. 2114, 2139, 68 L.Ed.2d 576, 608 (1981) (Rehnquist, J., dissenting on other grounds) (pointing out that when a state sues to advance its quasi-sovereign interests, it is not suing simply to protect the economic interests of its citizens).

811 F.2d at 1185.

Numerous other jurisdictions have held that federal and state ordered cleanups of environmental contamination are claims against the contaminator for "property damage" under the coverage provisions of comprehensive general liability policies.[9]

---

9. *See Continental Ins. v. Northeastern Pharmaceutical*, 842 F.2d at 983 ("we agree that environmental contamination caused by improper disposal of hazardous wastes can constitute 'property damage' "); *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986) ("discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause"); *Chesapeake Utils. Corp. v. American Home Assurance Co.*, 704 F. Supp. 551, 566 (D. Del. 1989) ("[t]o trigger coverage under the policies . . . [i]t is sufficient . . . that the insured was forced to pay damages because of property damage"); *New Castle County v. Hartford Acc. & Indem. Co.*, 673 F. Supp. 1359, 1366 (D. Del. 1987) ("[t]he complaint . . . clearly states claims for remedial action to remedy property damage, in this case harm to surface and groundwater"); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guaranty Co.*, 668 F. Supp. 1541, 1550 (S.D. Fla. 1987) ("[t]his exclusion is not applicable insofar as the underlying complaints allege damage to the property of adjoining landowners and the public"); *United States v. Conservation Chemical Co.*, 653 F. Supp. 152, 194 (W.D. Mo. 1986) ("environmental harm associated with the . . . site constitutes 'property damage' as such term is used and defined in the CGL

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

We agree with the foregoing authorities that the State's interest in protecting its natural resources is a form of property right. Thus, it follows that injury to these resources constitutes "property damage" within the meaning of the policies. We conclude that the contamination of the State's resources such as groundwater and soil on appellants' land is a "physical injury to . . . tangible property . . . during the policy period," and is therefore "property damage" within the meaning of the policies.

### C.

[3] Having concluded that "property damage" has occurred within the meaning of the policies, we now turn to the question of whether expenses incurred in cleaning up the contamination are "damages because of . . . property damage." The policies do not define the word "damages."

Spangler and Durham Life contend that under the policies, the word "damages" includes expenditures incurred in cleaning up toxic waste pursuant to government mandate. St. Paul and

[comprehensive general liability] insurance policies"); *Chemical Applications Co. v. Home Indem. Co.*, 425 F. Supp. 777, 778 (D. Mass. 1977) (parties stipulated that cleanup costs constituted "property damage" within the terms of the policy); *United States Fidelity and Guar. Co. v. Specialty Coatings Co.*, 2 Mealey's Litigation Rep. (Mealey Publications, Inc.) at C-3 (Ill. Cir. Ct. 22 June 1988) ("one who is alleged to pollute the ground and water of another obviously commits property damage"); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich. App. 579, 589, 336 N.W.2d 838, 843 (1983) ("contamination of subterranean and percolating water as a result of the fire is 'physical injury to tangible property' within the terms of the insurance policy"); *Upjohn Co. v. New Hampshire Ins. Co.*, 2 Mealey's Litigation Rep. (Mealey Publications, Inc.) at 3,752 (Mich. Cir. Ct. Jan. 5, 1987) ("damage caused by spilled distillate was of a type covered by the policies"); *CPS Chemical Co. v. Continental Insurance Co.*, 222 N.J. Super. 175, 188, 536 A.2d 311, 317 (1988) ("the insurers' obligation is to pay the costs of abating the polluting effects of prior discharges"); *Lansco, Inc. v. Dep't of Envtl. Protection*, 138 N.J. Super. 275, 282, 350 A.2d 520, 524 (1975), *aff'd*, 145 N.J. Super. 433, 368 A.2d 363 (1976), *cert. denied*, 73 N.J. 57, 372 A.2d 322 (1977) (court finding "property damage" under comprehensive general liability policy when insured incurs liability as a result of oil spill which damages environment); *Kutsher's Country Club Corp. v. Lincoln Ins. Co.*, 465 N.Y.S. 2d 136, 139 ("the oil spill does constitute 'property damage' as defined in the insurance policy"); *Sharon Steel Corp. v. Aetna Casualty and Sur. Co.*, 2 Mealey's Litigation Rep. (Mealey Publications, Inc.) at B-10 (Utah Dist. Ct. Jan. 15, 1988) ("[t]he policies' use of the phrase 'because of . . . property damages' countenances recovery for response costs even if property damage is merely a factual predicate therefor"). *Contra Aetna Casualty & Sur. Co. v. Gulf Resources & Chem. Corp.*, 709 F. Supp. 958, 961 (D. Idaho 1989) ("Because response cost liability is not based upon the existence of damage to persons or property, there is no coverage under the policies in question for such liability").

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

Travelers contend that the term "damages" does not cover this type of expenditure. Rather, they argue that "damages" only means compensation recovered by a third party in an action at law for injuries sustained by the third party at the hands of the insured.

We hold that the insureds' expenses incurred in complying with the State's compliance orders are "damages" as that term is used in the coverage provisions of the insurers' policies. We again apply the rules of construction discussed in Part II-A to decide the term's meaning in this context.

Travelers argues that "[t]he term 'damages' has been so consistently defined to include the type of compensation which the law awards for actual injury that this has become the plain, ordinary and accepted meaning as it has been used over the years in insurance policies." Several courts have reached the conclusion that Travelers urges. In *Continental Insurance Co. v. Northeastern Pharmaceutical*, 842 F.2d 977 (8th Cir. 1988) (*en banc*), the court held that under Missouri law the plain meaning of the term "damages" in the insurance context refers to legal damages and does not include cleanup costs or equitable monetary relief. In *Maryland Casualty Co. v. Armco*, 822 F.2d 1348 (4th Cir. 1987) (hereinafter "*Armco*"), the Fourth Circuit held under Maryland law that " '[d]amages' as distinguished from claims for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a legal claim for damages.' . . . Thus 'damages' is to be construed in consonance with its 'accepted technical meaning in law.' " *Armco*, 822 F.2d at 1352 (quoting *Aetna v. Hanna*, 224 F.2d 499, 503 (5th Cir. 1955) ).[10] The majority of cases which the insurers have submitted for our consideration rely on *Armco* and *Northeastern Pharmaceutical*.[11]

---

10. *Armco* was criticized by the Federal District Court for the District of Delaware in *Chesapeake Utilities*, 704 F. Supp. at 558-561. The Delaware federal court cited several decisions by the Maryland Court of Appeals which tended to show that under Maryland law, words in insurance contracts are given their customary and normal meaning rather than their technical meaning.

11. The *Armco* and *Northeastern Pharmaceutical* courts reached the consistent *result* that liability policies do not cover monies paid for cleaning up environmental contamination. However, the courts arrived at their conclusions for different *reasons*. The Eighth Circuit sitting *en banc* in *Northeastern Pharmaceutical* held that the ordinary meaning of the term "damages" does not include environmental cleanup costs incurred pursuant to government order. But in *Armco*, the Fourth Circuit did not use the "ordinary" meaning of the word damages to deny recovery. It held that the word has a technical meaning which only contemplates payments

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

Though the foregoing authorities hold that there is no coverage, the better reasoned decisions find that the term "damages" as used in the coverage provisions of liability policies includes the type of expenditures under consideration. Courts have found coverage under at least four different theories.

One theory is that the technical meaning of the word "damages" in this context includes the relief sought by plaintiff because there is legal coercion involved. In *Broadwell Realty v. Fidelity and Casualty Co.*, 218 N.J. Super. 516, 528 A.2d 76 (N.J. Super. A.D. 1987), the New Jersey appellate court stated:

> We . . . acknowledge that the word "damages" generally refers to a pecuniary compensation or indemnity . . . and that the cost of complying with an injunctive decree does not ordinarily fall within this definition. . . . This much conceded, we are entirely satisfied that the [State's] directive which threatened to assess [the insured] an amount equal to triple the costs of the prospective cleanup operation constituted a claim for damages within the meaning of the policy language. The insured's expenditures were made to discharge its legal obligation to the [State] or, at the very least, to prevent what would have been an avoidable legal obligation to pay damages to a third party. The expenses were incurred by virtue of the *in terrorem* and coercive effect of the [State's] directive. The harm to the State, by reason of discharge of pollutants into its streams, and to others was continuing and ongoing. Further peril was both imminent and immediate. Under these circumstances, the abatement and response expenses constituted "damages" which [the insured] was legally obliged to pay.

---

to injured parties in a *legal* action, but does not cover costs incurred in an equitable or administrative proceeding. Regardless of the analytical differences in these two cases, most subsequent decisions favoring insurers rely on *Armco* and *Northeastern Pharmaceutical*. See *Cincinnati Ins. Co. v. Milliken and Co.*, 857 F.2d 979, 981 (4th Cir. 1988) ("in the insurance context the word 'damages' is not ambiguous. It means legal damages"); *Argonaut Ins. Co. v. Atlantic Wood Indus., Inc.*, No. 87-0323-R, slip op. at 1 (E.D. Va. June 20, 1988) (final judgment order) ("the environmental cleanup costs or 'response costs' for which the defendant claims coverage, do not constitute 'damages' within the meaning of the comprehensive general liability policies issued by the plaintiff"); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F. Supp. 950, 954 (N.D. Ill. 1988) ("cost recovery claims . . . do not seek damage relief, but are restitutional in nature"); *Hayes v. Maryland Casualty Co.*, 688 F. Supp. 1513, 1515 (N.D. Fla. 1988) ("the expenses that [the State] seeks to recover are not damages within the meaning of the policy here involved").

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

*Id.* at 527-28, 528 A.2d at 82.

A second theory is that the word "damages" has a plain, ordinary meaning which includes the type of expenses under consideration because a reasonable business person purchasing a comprehensive general liability insurance policy would expect cleanup of toxic wastes pursuant to government order to be covered unless the policy explicitly limited the term's meaning. In *National Indemnity Co. v. United States Pollution Control*, 717 F. Supp. 765 (W.D. Okla. 1989), a federal district court applying Oklahoma law concluded that the term "damages" in a liability policy covered response and environmental cleanup costs. Because the policy did not "affirmatively limit the definition of damages to the legal definition only," *id.* at 766, the court determined that the plain, ordinary meaning of the word applied. The court relied on the definition of damages found in Webster's Third New International Dictionary: "the estimated reparation in money for detriment or injury sustained: compensation or satisfaction imposed by law for a wrong or injury caused by violation of a legal right." *National Indemnity Co.*, 717 F. Supp. at 767. Because the plain meaning did not distinguish between legal and equitable actions, the court concluded that government-mandated cleanup was covered under the policy.

In *Aerojet-General v. Superior Court (Cheshire and Companies, real party in interest)*, 257 Cal. Rptr. 621, *reh'g denied*, 258 Cal. Rptr. 684 (1989), the California Court of Appeals noted that there is a technical meaning for "damages" similar to that employed in *Armco.* 257 Cal. Rptr. at 626. However, the court recognized that there are other definitions for the term, including that "damages" means "compensation in money imposed by law for loss or injury" (citing Webster's New Collegiate Dictionary, p. 286):

> It is not unreasonable to argue that while a technical meaning of "damages" may refer to an award in an action at law, the ordinary plain meaning of damages is broader and covers environmental response costs incurred at the behest of government entities and under express or implied sanction of law.

257 Cal. Rptr. at 626. The California court determined that a reasonable person in the position of the insured would expect that environmental cleanup costs incurred pursuant to governmental mandate are "damages" within the meaning of his liability policy. *Id.* at 626-27. Other courts have drawn the same conclusion for

150        IN THE SUPREME COURT

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

similar reasons. *See, e.g., Avondale Industries, Inc. v. Travelers Indemnity Co.,* 887 F.2d 1200, 1207 (2d Cir. 1989) ("an ordinary businessman reading [the] policy would have believed himself covered for the demands and potential damage claims now being asserted in the . . . administrative proceeding"); *United States Fidelity and Guaranty Co. v. Thomas Solvent,* 683 F. Supp. 1139, 1168 (W.D. Mich. 1988) ("from the standpoint of the insured damages are being sought for injury to property. It is that contractual understanding rather than some artificial and highly technical meaning of damages which ought to control"); *Boeing Co. v. Aetna Cas. & Sur. Co.,* 784 P.2d 507, 512 (1990) ("Courts consistently agree that the 'common-sense' understanding of damages within the meaning of the policy 'includes a claim which results in causing [the policyholder] to pay sums of money because his acts or omissions affected adversely the rights of third parties.' ") (quoting *Thomas Solvent,* 683 F. Supp. at 1168).

A third theory concentrates on the substance of governmental cleanup mandates rather than their form to find coverage. In *United States Aviex v. Travelers,* 125 Mich. App. 579, 336 N.W.2d 838 (1983), the Michigan Court of Appeals stated:

> It is merely fortuitous from the standpoint of either plaintiff or defendant [insurer] that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of cleanup itself and then suing plaintiff to recover those costs. The damage to the natural resources is simply measured in the cost to restore the water to its original state. . . . Defendant must defend and indemnify plaintiff against such claims and costs under the insurance policy.

*Id.* at 590, 336 N.W.2d at 843 (citations omitted). The Federal District Court for the Eastern District of Michigan followed *United States Aviex* in *Firemen's Fund v. Ex-Cell-O Corp.,* 662 F. Supp. 71 (E.D. Mich. 1987). *United States Aviex* and *Ex-Cell-O* concentrate on the nature of the expenditures, the presence of legal coercion, and injury to the public to hold the insurers liable under their policies for toxic waste cleanup.

The fourth theory is that when "property damage" to a third party occurs within the meaning of the policy, costs associated with remedying that injury are "damages." In *Boeing Co. v. Aetna*

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

*Cas. & Sur. Co.*, 748 P.2d at 510, the Washington Supreme Court considered a liability policy which provided that the insurer "pay on behalf of the insured all sums which the insured shall become obligated to pay *as damages* * * * because of property damage." In concluding that response costs incurred pursuant to a United States Environmental Protection Agency order were covered under the policy, the court stated that "[t]he occurrence of the hazardous wastes leaking into the ground contaminating the groundwater, aquifer and adjoining property constituted 'property damage' and thus triggered the 'damages' provision of the policies carried by the policyholders." *Id.* at 516.

In *Port of Portland v. Water Quality Insurance Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986), the Ninth Circuit court stated: "We agree with the district court that the 'reasonable, enlightened view' that the Oregon Supreme Court would adopt would be that discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause." In other words, once "property damage" occurs injuring a third party, costs associated with remedying it are "damages" within the meaning of the liability policy. The existence of "property damage" under the policy bootstraps the coverage provisions into use.

We find all four of these theories have some merit. We rest our decision, however, on the basis that the term "damages" is not being used in its legal and technical sense in these policies. As these cases show, it is a term easily susceptible to more than one definition. Clearly, there is a specific, technical definition for the word: "payments to third persons when those persons have a legal claim for damages." *Hanna*, 224 F.2d at 503. If the insurer intended that "damages" have only this meaning, it should have so indicated in the policy. The insured would then have understood that cleanup costs incurred pursuant to government mandate were not covered, and would have been able to enter into other insuring arrangements. Because such a limiting definition was not included in the policy, we must conclude that the parties did not intend "damages" to have a specific technical meaning in the insurance policy. Rather, they intended to use its ordinary meaning. Use of the plain, ordinary meaning of a term is the preferred construction. *Woods*, 295 N.C. at 505-06, 246 S.E.2d at 777. *Cf. Waste Management of Carolinas, Inc.*, 315 N.C. at 694, 340 S.E.2d at 379.

**C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.**

[326 N.C. 133 (1990)]

In construing the ordinary and plain meaning of disputed terms, this Court has used "standard, nonlegal dictionaries" as a guide. *Insurance Co. v. Insurance Co.*, 266 N.C. 430, 438, 146 S.E.2d 410, 416 (1966); *see Waters v. Lumber Co.*, 115 N.C. 649, 654, 20 S.E. 718, 720 (1894). The American Heritage Dictionary Of The English Language 333 (1969) defines the term "damages" as "[m]oney paid or ordered to be paid as compensation for injury or loss." The Random House Dictionary of The English Language 504 (2d ed. 1987) and Webster's Third New World International Dictionary 571 (1976), however, define damages more broadly as the estimated money equivalent "for detriment or injury sustained."

Because the policy term "damages" is uncertain and capable of several reasonable interpretations, this Court must employ the interpretation which favors the policyholder. *Woods v. Insurance Co.*, 295 N.C. at 505-06, 246 S.E.2d at 777. Reading the policy provisions as a whole and assuming none of the exclusions apply, we conclude that a "reasonable person in the position of the insured" may have understood that the term "damages" included state-ordered environmental cleanup costs. *See Grant v. Insurance Co.*, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978); *Financial Services v. Capital Funds*, 288 N.C. 122, 143, 217 S.E.2d 551, 565 (1975).[12]

Finally, our words in *Insurance Co. v. Insurance Co.*, 266 N.C. at 437-38, 146 S.E.2d at 416, are equally applicable here:

When an insurance company, in drafting its policy of insurance, uses a "slippery" word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the

---

12. In addition to the court decisions cited above, several commentators have concluded that comprehensive general liability policies should be given a broad reading. *See* Chesler, Rodburg & Smith, *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Waste Site Liability*, 18 Rutgers L.J. 9, 14 (1986) ("CGL [comprehensive general liability] insurance purchased by commercial enterprises provides indemnity for, and defense against, the broadest spectrum of property damage . . . brought by third parties arising out of day to day business operations"); *Developments in the Law—Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1576 (1986) (comprehensive general liability policy "provides coverage for all 'occurrences' causing damage"); Note, *The Applicability of General Liability Insurance to Hazardous Waste Disposal*, 57 S. Cal. L. Rev. 745, 757 (1984) ("The very title 'Comprehensive General Liability Insurance' suggests the expectation of maximum coverage. . . . If a risk neither party contemplated develops, the comprehensive policy must necessarily cover that risk. Indeed, protection against unknown risks is the very reason the insured purchases comprehensive liability insurance").

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound.

We conclude that cleanup costs incurred pursuant to the State's compliance orders are "damages" within the policies' meaning.

### D.

[4] The policy provision governing the insurers' duty to defend states:

> [T]he Company shall have the right and duty to defend any *suit* against the insured seeking *damages* on account of . . . *property damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or *suit* as it deems expedient . . . .

The term "suit" is not defined in the policy.

Appellees Travelers and St. Paul urge us to affirm the trial court's ruling that compliance orders are not "suits" triggering the insurers' duty to defend under the policies. Appellants Spangler and Durham Life argue that such a strict interpretation of the term is contrary to principles governing judicial construction of insurance policies which have led courts consistently to hold that the duty to defend is much broader than the obligation to indemnify. They claim they are entitled to a defense to determine the extent of their duties under the statutes and regulations which may apply.

We hold that the issuance of compliance orders constitutes "suits" within the meaning of these policies. We again rely on the principles set out under Part II-A.

In *Waste Management of Carolinas, Inc.*, 315 N.C. at 691, 340 S.E.2d at 377, we stated:

> Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy. An insurer's duty to defend is ordinarily measured by the facts as alleged in the

C. D. SPANGLER CONSTR. CO. v. INDUSTRIAL CRANKSHAFT & ENG. CO.

[326 N.C. 133 (1990)]

pleadings; its duty to pay is measured by the facts ultimately determined at trial. When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable. Conversely, when the pleadings allege facts indicating that the event in question is not covered, and the insurer has no knowledge that the facts are otherwise, then it is not bound to defend.

(Citations and footnote omitted.) We must analyze the policy provisions and compare them with the events as alleged. *Id.* at 693, 340 S.E.2d at 378. Under this so-called "comparison test" the pleadings are read side-by-side with the policy to determine whether the events as alleged are covered or excluded. *Id.* None of the parties argue that "suit" is a technical term which should be given anything other than its ordinary speech interpretation. Thus, we conclude it is a nontechnical word and should be given that meaning it has acquired in ordinary speech. *See Woods v. Insurance Co.,* 295 N.C. at 505-06, 246 S.E.2d at 777.

Standard dictionary definitions of the term "suit" include court proceedings to enforce or recover on a right or claim. The Random House Dictionary of The English Language 1902 (2d ed. 1987) ("[t]he act, the process, or an instance of suing in a court of law"); Webster's Third New International Dictionary 2286 (1976) ("an action or process in a court for the recovery of a right or claim"); The American Heritage Dictionary Of The English Language 1287 (1969) ("Any proceeding in a court to recover a right or claim"). However, not all definitions of "suit" require a court or other adjudicatory proceeding. A second entry in Webster's Third New World International Dictionary 2286 (1976) defines "suit" as "the attempt to gain an end by legal process."

We believe the compliance orders under consideration fall within this broader definition. In each of these orders the State, pursuant to statute, directed appellants to take certain remedial actions required by state law. These compliance orders were an attempt by the State to "gain an end by legal process." Reading the policies as a whole and assuming none of the exclusions apply, we find that a "reasonable person in the position of the insured" may not have understood the term "suit" as limiting appellees' duty to defend until a court proceeding had been instigated. *See Grant v. Insurance Co.,* 295 N.C. at 43, 243 S.E.2d at 897; *Financial Services v. Capital Funds,* 288 N.C. at 143, 217 S.E.2d at 565. Because this Court must give effect to reasonable interpretations which favor the policyholder, we conclude that the term "suit" as used

in the policies covers the compliance orders. *See Woods v. Insurance Co.*, 295 N.C. at 506, 246 S.E.2d at 777.

We also note that many cases from other jurisdictions addressing this issue have also addressed the "property damage" and "damages" questions we discussed above. Our research has uncovered no decisions where environmental cleanup expenses were deemed "damages because of property damage," but where the administrative orders requiring cleanup were not deemed "suits." In this context, invocation of the narrower duty to indemnify *a fortiori* invokes the broader duty to defend.

We hold that the trial court erred in granting summary judgment to appellees on the grounds that "[t]he State's Compliance Orders issued to [appellants] do not constitute 'suits' within the terms of the liability coverage provisions of the insurance policies and that the moving insurers have no duty of defense under the insurance policies in connection with the Compliance Orders."

In summary, we hold that within the meaning of these policies, (1) injury to the State's natural resources is "property damage"; (2) costs incurred pursuant to State order to remedy this environmental injury are "damages" which the insured was legally obligated to pay because of such property damage; and (3) the State's orders requiring cleanup of toxic wastes are "suits" giving rise to the insurers' duty to defend. Because the trial court erred in this proceeding, its order is, therefore,

Reversed.

Justice MITCHELL did not participate in the consideration or decision of this case.