Duke Energy Carolinas, LLC v. AG Ins. SA/NV, 2020 NCBC 46.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

DUKE ENERGY CAROLINAS, LLC
and DUKE ENERGY PROGRESS,
LLC,

Plaintiffs,

v.

AG INSURANCE SA/NV (f/k/a
L'Etoile S.A. Belge d'Assurances); et
al.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 5594

**ORDER AND OPINION ON MOTION
OF DEFENDANTS ASSOCIATED
ELECTRIC & GAS INSURANCE
SERVICES LIMITED, BERKSHIRE
HATHAWAY DIRECT INSURANCE
COMPANY (F/K/A AMERICAN
CENTENNIAL INSURANCE
COMPANY), AND TIG INSURANCE
COMPANY, AS SUCCESSOR TO
RANGER INSURANCE COMPANY,
FOR PARTIAL SUMMARY
JUDGMENT REGARDING
COVERAGE FOR THE MAYO STEAM
ELECTRIC GENERATING PLANT**

1.     **THIS MATTER** is before the Court on the Motion of Defendants Associated

Electric & Gas Insurance Services Limited ("AEGIS"), Berkshire Hathaway Direct

Insurance Company (f/k/a American Centennial Insurance Company ("ACI")), and

TIG Insurance Company, as successor to Ranger Insurance Company ("Ranger"),

(collectively, the "AEGIS Defendants") for Partial Summary Judgment Regarding

Coverage for the Mayo Steam Electric Generating Plant (the "Motion") filed

November 27, 2019.[1]  (ECF No. 582.)

2.     Having considered the Motion, the briefs and related materials submitted

in support of and in opposition to the Motion, the arguments of counsel at the hearing

---

[1] Defendants Fireman's Fund Insurance Company ("FFIC"), Federal Insurance Company
("Federal"), Pacific Employers Insurance Company ("PEIC"), and United States Fire
Insurance Company ("U.S. Fire") joined the Motion.  (ECF Nos. 612, 618, 620.)  U.S. Fire also
joined the AEGIS Defendants' reply.  (ECF No. 719.)

on the Motion, and other appropriate matters of record, the Court **DENIES** the

Motion for the reasons set forth below.

*Pillsbury Winthrop Shaw Pittman LLP, by Matthew G. Jeweler, Mark J. Plumer, W. Kirk Gandy, Barry Fleishman, Aaron D. Coombs, William C. Miller, and Jeffrey W. Mikoni, and Hunton & Williams LLP, by A. Todd Brown and Ryan G. Rich, for Plaintiffs Duke Energy Carolinas, LLC and Duke Energy Progress, LLC.*

*Rivkin Radler LLP, by Steven Zuckermann, Alan S. Rutkin, George D. Kappus, Greg E. Mann, and Gregory J. Klubok, and Goldberg Segalla, by David G. Harris, II and David L. Brown, for Defendants Associated Electric and Gas Insurance Services Ltd., Berkshire Hathaway Direct Insurance Company, and TIG Insurance Company.*

*Squire Patton Boggs (US) LLP, by Paul Kalish and Eridania Perez, and McAngus Goudelock & Courie, by Jeffrey Kuykendal, for Defendants Allianz Global Risks US Insurance Company, Allianz Underwriters Insurance Company, and Fireman's Fund Insurance Company.*

*Kennedys CMK LLP, by John D. LaBarbera, Benjamin A. Blume, and Michael J. McNaughton, and James, McElroy & Diehl, P.A., by Adam L. Ross, for Defendant United States Fire Insurance Company.*

*White and Williams, LLP, by Shane Heskin, and Fitzgerald Litigation, by Andrew L. Fitzgerald, for Defendants Century Indemnity Company, Federal Insurance Company, and Pacific Employers Insurance Company.*

*Windels Marx Lane & Mittendorf LLP, by Eric J. Konecke, for Defendant Allstate Insurance Company.*

*Freeborn & Peters LLP, by Bruce M. Engel, for Defendant Arrowood Indemnity Company.*

*Jackson & Campbell PC, by Erin N. McGonagle, for Defendants AIG Property Casualty Company, American Home Assurance Company, and Lexington Insurance Company.*

*Hogan Lovells US LLP, by Alexander B. Bowerman, for Defendant Assurances Générales de France.*

*Clausen Miller P.C., by Ilene Korey, for Defendant Old Republic Insurance Company.*

*Karbal Cohen Economou Silk Dunne LLC, by Dena Economou, for Defendants First State Insurance Company and Twin City Fire Insurance Company.*

*Saiber LLC, by Michael J. Balch, for Defendant General Reinsurance Corporation.*

*Hinkhouse Williams Walsh LLP, by William C. Joern, for Defendant Continental Insurance Company.*

Bledsoe, Chief Judge.

I.

FACTUAL AND PROCEDURAL BACKGROUND

3. This action focuses on whether Defendants—all insurers who issued excess level insurance policies to Plaintiffs Duke Energy Carolinas, LLC ("DEC") (formerly Duke Power Company ("Duke Power")) and Duke Energy Progress, LLC ("DEP") (formerly Carolina Power & Light Company ("CP&L")) (collectively, "Duke")—are obligated to compensate Duke for alleged liabilities linked to coal combustion residuals ("CCRs"), i.e., coal ash, at fifteen Duke-owned power plants in North and South Carolina. This Motion focuses on one such facility, the DEP-owned Mayo Steam Electric Generating Plant ("Mayo," the "Mayo Plant," or the "Plant"), located near Roxboro, Person County, North Carolina.

4. The Court does not make findings of fact on motions for summary judgment but rather summarizes material facts it considers to be uncontested. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

5.   Although the evidence in the record is sparse, the parties appear to agree that the Mayo Plant began operations in 1983. Mayo contains one ash pond, or basin, which is used for the disposal of coal ash generated by the Plant. (*See* Am. Compl. ¶ 80, ECF No. 232; Mem. Law Supp. Mot. Partial Summ. J. Defs. AEGIS, Berkshire Hathaway Direct Ins. Co. (f/k/a ACI), & TIG Ins. Co., Successor to Ranger, Regarding Coverage Mayo Steam Electric Generating Plant 5 [hereinafter "AEGIS Defs.' Supp. Br."], ECF No. 583.)

6.   The AEGIS Defendants issued insurance policies to CP&L from 1981 to 1986 (the "Policies").[2] (Mot. Partial Summ. J. Defs. AEGIS, Berkshire Hathaway Direct Ins. Co. (f/k/a ACI), & TIG Ins. Co., Successor to Ranger, Regarding Coverage Mayo Steam Electric Generating Plant 1, ECF No. 582.)

7.   The AEGIS Defendants contend that the undisputed evidence shows Duke intentionally caused the property damage for which it seeks coverage at Mayo and that the "intentional injury exclusion" in the Policies (the "Exclusion") bars Duke's Mayo-based claims as a matter of law.

8.   After full briefing, the Court held a hearing on the Motion by videoconference on March 12, 2020 (the "Hearing"), at which Duke, the AEGIS Defendants, and other appearing Defendants were represented by counsel. The Motion is now ripe for resolution.

---

[2] The Policies at issue in this Motion are identified at Appendix A.

## II.

## LEGAL STANDARD

9.    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *CSX Transp., Inc. v. City of Fayetteville*, 247 N.C. App. 517, 521, 785 S.E.2d 760, 763 (2016) (quoting *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations and internal quotation marks omitted). The Court views evidence in the light most favorable to the nonmoving party. *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) (citing *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

10.    The moving party bears the burden of showing that there is no genuine issue of material fact, *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002), and may meet this burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party

cannot produce evidence to support an essential element of [its] claim[,]" *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted). If the moving party meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000); *see also* N.C. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.").

### III.

### ANALYSIS

11. As an initial matter, "[a]n insurance policy is a contract and its provisions govern the rights and duties of the parties thereto." *C. D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 142, 388 S.E.2d 557, 562 (1990) (citing *Fid. Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986)). Thus, our Supreme Court has directed that "[w]hen interpreting an insurance policy, courts apply general contract interpretation rules." *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295, 838 S.E.2d 454, 456 (2020).

12. "As with all contracts, the goal of construction is to arrive at the intent of the parties when the policy was issued." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978) (citing *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354–55, 172 S.E. 2d 518, 522–23 (1970)). In discerning the parties' intent, "[t]he various terms of the policy are to be harmoniously

construed, and if possible, every word and every provision is to be given effect." *C. D. Spangler Constr.*, 326 N.C. at 142, 388 S.E.2d at 563 (quoting *Woods*, 295 N.C. at 506, 246 S.E.2d at 777); *see also Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 9, 692 S.E.2d 605, 612 (2010) (same).

13. "[A] contract of insurance should be given that construction which a reasonable person in the position of the insured would have understood it to mean[.]" *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978). As emphasized by our appellate courts, the "intention of the parties as gathered from the language used in the policy is the polar star that must guide the courts[.]" *Cowell v. Gaston Cty.*, 190 N.C. App. 743, 746, 660 S.E.2d 915, 918 (2008) (quoting *McDowell Motor Co. v. N.Y. Underwriters Ins. Co.*, 233 N.C. 251, 253, 63 S.E.2d 538, 540 (1951)). "In North Carolina, determining the meaning of language in an insurance policy presents a question of law for the Court." *Accardi*, 373 N.C. at 295, 838 S.E.2d at 456.

14. Sometimes policy language may be ambiguous. An ambiguity exists where "in the opinion of the court, the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." *Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522. In those circumstances, our Supreme Court has instructed that "any ambiguity or uncertainty as to the words used in the policy should be construed against the insurance company and in favor of the policyholder or beneficiary." *Accardi*, 373 N.C. at 295, 838 S.E.2d at 456; *see also Woods*, 295 N.C. at 506, 246 S.E.2d at 777. This rule of construction applies whether the provision at issue extends or excludes coverage. *See, e.g., Buzz Off Insect Shield,*

364 N.C. at 9–10, 692 S.E.2d at 612 ("[T]his Court construes liberally insurance policy provisions that extend coverage so as to provide coverage, whenever possible by reasonable construction[.]" (citation, brackets, and internal quotation marks omitted)); *Wachovia Bank & Tr.*, 276 N.C. at 355, 172 S.E.2d at 522–23 ("[E]xclusions from, conditions upon and limitations of undertakings by the company, otherwise contained in the policy, are to be construed strictly so as to provide the coverage, which would otherwise be afforded by the policy.").

15. Nevertheless, "[i]f a court finds that no ambiguity exists, . . . the court must construe the document according to its terms." *Accardi*, 373 N.C. at 295, 838 S.E.2d at 456; *see also Woods*, 295 N.C. at 506, 246 S.E.2d at 777 ("[I]f the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.").

16. Here, the Exclusion at issue provides, in relevant part, that the Policies will not apply:

> [T]o liability of any INSURED for BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE caused intentionally by or at the direction of such INSURED, provided this exclusion shall not apply with respect to BODILY INJURY, PERSONAL INJURY or PROPERTY DAMAGE occurring while safeguarding, preserving, protecting or defending person or property[.]

(Aff. Greg E. Mann [hereinafter "Mann Aff."] Ex. 26, at Exclusion C, ECF No. 586.26.)

17. "Property damage" is defined under the Policies as:

(1) [P]hysical injury to or destruction of tangible property which occurs during the POLICY PERIOD, including the loss of use thereof at any time resulting therefrom; or

(2) loss of use at any time of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an accident or an event or continuous or repeated exposure to conditions during the POLICY PERIOD.

(Mann Aff. Ex. 26 § III(m).)

18. None of the parties seriously contends that the Exclusion provision is ambiguous, and the Court concludes that it is not—by its unambiguous terms, the Exclusion applies to "property damage" "caused intentionally by or at the direction of [Duke.]" The parties vigorously dispute, however, the provision's application on the record facts here.

19. The AEGIS Defendants contend that the undisputed evidence shows Duke was fully aware when it began operations at Mayo in 1983 that Duke's normal and expected operations at the Plant would result in detectable levels of groundwater contamination and thus that Duke intended the property damage for which it now seeks coverage. (AEGIS Defs.' Supp. Br. 2–4; Mar. 12, 2020 Hearing Tr. 17:20–18:5 [hereinafter "Tr."], ECF No. 749.)

20. Duke disagrees and argues that it has offered substantial evidence showing that Duke did not know, and thus could not have intended, that its operations at the Mayo Plant would result in measurable amounts of groundwater contamination, much less levels of contamination "in the form and to the degree for which it faces liability under [the North Carolina Coal Ash Management Act of 2014, N.C.G.S.

§ 130A-309.200 *et seq.* ("CAMA")]."[3] (Duke's Opp'n Mot. Partial Summ. J. Regarding Coverage Mayo Electric Steam Plant 6 [hereinafter "Duke's Opp'n Br."], ECF No. 669.)

21. For its evidence, the AEGIS Defendants primarily rely upon:

(i) letters from the Environmental Protection Agency ("EPA") in June 1978 and June 1981 advising that the use of an unlined ash pond at Mayo could be "expected" to result in groundwater contamination;[4]

(ii) a 1978 Duke-commissioned study by hydrologist Edwin Floyd forecasting that a "small amount of leachate" (i.e., metals from coal ash) would flow under the dam at the Mayo ash basin into an adjacent stream if Duke constructed an unlined ash pond, (Aff. Edwin O. Floyd [hereinafter "Floyd Aff."] Ex. A, at DUKE_CAIR_005581850, ECF No. 585.1);

---

[3] CAMA was passed in September 2014 following the February 2014 spill of coal ash into the Dan River at Duke's Dan River Steam Station in Rockingham County, North Carolina. (Mann Aff. Ex. 20 Excerpts Dep. Phil Longueira, dated November 18, 2019, at 15:12–24, 18:2–18, 27:5–17, 31:19–32:19, ECF No. 586.20; Duke's Opp'n Br. Ex. 26 Excerpts Dep. Tr. – Philip M. Longueira (Nov. 18, 2019), at 35:22–25, 39:1–22, ECF No. 669.1.) Through CAMA, the North Carolina General Assembly required Duke to take certain remedial actions at its North Carolina power plants, including Mayo. (Duke's Opp'n Br. Ex. 25 Excerpts Dep. Tr. – David L. Doss, Jr. (Dec. 6, 2019), at 27:10–24, ECF No. 669.1; *see also* First Am. Compl. ¶¶ 46–50, 80–82.)

[4] (*See* Mann Aff. Ex. 1 June 26, 1978 Letter White (EPA) to Col. Hight (U.S. Army Corps of Engineers), at DUKE_CAIR_003145792, 003145794–95, ECF No. 586.1; Mann Aff. Ex. 3 June 25, 1981 Letter Zeller (EPA) to Helms (N.C. Dept. Natural Resources & Community Development), at DUKE_CAIR_007564362, ECF No. 586.3.)

(iii) testimony from Duke witnesses purporting to suggest that contamination of a small portion of groundwater to dilute contaminants as they moved away from the pond was "an essential feature of the ash pond design";[5]

(iv) Duke's accounting treatment of its ash-related costs as asset retirement obligations ("AROs"), reflecting Duke's alleged admission that groundwater contamination was part of the "normal operation" of the pond that was "predictable and likely of occurring";[6]

(v) contemporaneous complaints from adjoining landowners;[7] and

(vi) testimony from Mick Greeson, a former employee in CP&L's environmental permit unit, allegedly acknowledging that CP&L permitted some groundwater contamination at Mayo because it did not anticipate that anyone would be able to drink the groundwater.[8]

---

[5] (*See* AEGIS Defs.' Supp. Br. 11; Mann Aff. Ex. 8 Excerpts Dep. Brenda Brickhouse, dated December 14, 2018, at 81:22–83:12, 107:3–5, 161:24–62:18, 165:9–66:3, ECF No. 586.8; Mann Aff. Ex. 10 Excerpts Test. Jon Kerin, Duke's Director of Health & Safety, in DEP Rate Case, at 36:19–20, ECF No. 586.10.)

[6] (*See* AEGIS Defs.' Supp. Br. 15–16; Mann Aff. Ex. 17 Excerpts Financial Accounting Standards Board § 410-20-15, ECF No. 586.17; Mann Aff. Ex. 18 Excerpts Statement Financial Accounting Standards, issued June 2001, at AEGIS_001973, ECF No. 586.18; Mann Aff. Ex. 19 Redacted Excerpts Mem. by Duke Employee Phil Longueira, at DT00002219, ECF No. 586.19; Mann Aff. Ex. 20, at 56:4–57:13, 72:12–17, ECF No. 586.20.)

[7] (*See* Mann Aff. Ex. 2 Excerpts 1978 Final Environmental Impact Statement by U.S. Army Corps of Engineers, Wilmington District, at DUKE_CAIR_003963090–91, 003963321–23, 003963397–411, ECF No. 586.2; Mann Aff. Ex. 22 Aff. Doyle Peed, dated April 24, 2019 ¶ 8, ECF No. 586.22.)

[8] (*See* Reply Br. Defs. AEGIS, Berkshire Hathaway Direct Ins. Co. (f/k/a ACI), & TIG Ins. Co., Successor to Ranger, Regarding Coverage Mayo Steam Electric Generating Plant 7 [hereinafter "AEGIS Defs.' Reply Br."], ECF No. 716; Aff. Greg E. Mann Supp. Reply Partial Summ J. Defs. AEGIS, Berkshire Hathaway Direct Ins. Co. (f/k/a ACI), & TIG Ins. Co., Successor to Ranger, Regarding Coverage Mayo Steam Electric Generating Plant Ex. H

22.     In opposition, Duke argues that this evidence does not permit the conclusions the AEGIS Defendants seek to draw.  (Duke's Opp'n Br. 8, 10, 13–14, 16.) For its support, Duke offers evidence tending to show that:

(i)     Duke responded to the EPA's concerns in developing the final design of the coal ash basin that was actually constructed several years later, (Duke's Opp'n Br. Ex. 7 Letter CP&L to EPA (July 13, 1978), ECF No. 669.1);

(ii)     Floyd, the hydrologist, in the same quoted section of his report, ultimately concluded that the water flowing underneath the dam at the Mayo ash basin "should be rendered essentially free of excess heavy minerals[,]" (Floyd Aff. Ex. A, at DUKE_CAIR_005581849–50);[9]

(iii)     the Duke testimony and documents on which the AEGIS Defendants rely originate after 2009 and are from employees who were not involved in coal ash and groundwater issues during the relevant timeframe;[10]

---

Excerpts Dep. Mick Greeson, dated September 25, 2019, at 65:10–66:11 [hereinafter "Greeson Dep."], ECF No. 717.8; Duke's Opp'n Br. Ex. 17 Aff. Mickey R. Greeson (Feb. 5, 2020) ¶ 2, ECF No. 669.1.)

[9] The relevant portion of Floyd's report states as follows:

> The *small amount of leachate* that may flow under the [ash pond] dam should be rendered *essentially free of excess heavy minerals* through the action of filtration through the soil and dilution with the natural ground waters within a few hundreds of feet below the dam or by the time natural discharge returns it to the stream.

(Floyd Aff. Ex. A, at DUKE_CAIR_005581850 (emphasis added).)

[10] (*See* Duke's Opp'n Br. Ex. 22 Excerpts Dep. Tr. – Brenda Brickhouse (Dec. 14, 2018), at 10:17–11:13, 13:18–14:5, 165:5–66:3, ECF No. 669.1; Duke's Opp'n Br. Ex. 24 Excerpts 30(b)(6) Dep. Tr. – Ed Sullivan (Dec. 11, 2019), at 63:24–67:19, ECF No. 669.1; Duke's Opp'n Br. Ex. 25, at 27:10–29:17, 55:5–56:7; Duke's Opp'n Br. Ex. 26, at 33:15–35:6, 39:15–41:1;

(iv)     Duke did not treat costs as an ARO until after CAMA was passed in 2014, a years-later accounting determination that does not reflect Duke's knowledge and intent at the time the Policies were issued, (Duke's Opp'n Br. Ex. 25, at 27:10–29:17, 55:5–56:7; Duke's Opp'n Br. Ex. 26, at 33:15–35:6, 39:15–41:1); and

(v)     CP&L's Greeson did not testify that CP&L knowingly permitted groundwater contamination at Mayo, a point he directly refuted by subsequent affidavit, (Duke's Opp'n Br. Ex. 17 ¶¶ 3–4), but rather testified that if groundwater contamination did occur, Duke did not expect adverse health impacts.[11]

---

App'x B, 15 N.C. Admin. Code Subchapter 2L (1979), ECF No. 669.2; App'x C, 15 N.C. Admin. Code Subchapter 2L § .0107 (1989), ECF No. 669.2.)

[11] Greeson testified, in relevant part, that

> Q. So it was part of your thinking that, yes, there was going to be seepage that would go into the groundwater; but given that that groundwater was going to flow into the river, and given that it was the same water that you were discharging, effectively, under permit, it shouldn't matter, or shouldn't be improper?

> A. Well, it would matter, but we didn't think, on a comparative basis, it would be significant, in terms of environmental impact. I mean, there was no opportunity – the groundwater standards were established to protect public health, primarily, because 52 percent of North Carolinians used well water. But at our ash pond -- at our coal-fired power plants, we owned -- there was no opportunity for anyone -- well, certainly at the time, we felt that there was little opportunity for anyone to drink the groundwater around the ash ponds, because it was flowing toward the river, and we owned the land. I mean, that was the general thinking in the early '80s.

> Q. And therefore that you felt that the seepage that was going into the groundwater, containing whatever ash constituents it contained, wasn't going to cause any harm to the interests that the standards were intended to protect; is that correct?

23. Duke also offers affirmative evidence it argues shows that Duke did not intend to cause groundwater contamination at Mayo, (Duke's Opp'n Br. 8, 10–14), including:

(i) a report conducted by Radian Corporation for the Electric Power Research Institute upon which Duke relied in deciding to build the basin that concluded "any potential impacts to groundwater were negligible[,]"[12] (Duke's Opp'n Br. 8; Duke's Opp'n Br. Ex. 7, at DUKE_CAIR_003961687);

(ii) a report from Duke's engineering consultant, also upon which Duke relied, that concluded Duke's design to construct the pond with a clay soil liner would prevent seepage of contaminants into groundwater, (Mann Aff. Ex. 5 June 13, 1966 Letter Weston (Gibbs & Hill) to Thompson (CP&L), ECF No. 586.5);

(iii) the approvals and permits issued by North Carolina state regulators approving Duke's plan to build and operate the coal ash basin and their

A. Yes.

(Greeson Dep. 65:10–66:11.)

[12] A 1975 report sponsored by the Electric Power Research Institute and prepared by Radian Corporation states that "[p]assage of pond effluent through soil was found to provide significant protection against ground-water contamination by trace elements[,]" that "careful selection of a pond site underlain by soil with sufficiently high sorption capacity" (i.e., capacity to remove trace elements) would mitigate the risk from trace elements, and that "ash and sludge materials will tend to be self-sealing[,]" thus lessening potential groundwater contamination over time. (Duke's Opp'n Br. Ex. 8 Environmental Effects of Trace Elements from Ponded Ash & Scrubber Sludge, Radian Corporation (1975), ECF No. 669.1.)

conclusion that quarterly monitoring was all that was "necessary to assure that pollutants are not discharged to the ground waters";[13]

(iv)    testimony from a former North Carolina state regulator and Duke's regulatory compliance personnel reflecting that they had no concerns regarding groundwater contamination at Mayo at the time the Policies were issued;[14] and

(v)    results from Duke's testing at Mayo in 1982 that showed no adverse impacts to groundwater, (Duke's Opp'n Br. Ex. 10 ¶¶ 10–12).

24.    To resolve the Motion, the Court must consider whether the AEGIS Defendants have offered undisputed evidence compelling the conclusion that Duke intended to cause property damage—defined in the Policies as "physical injury to or destruction of tangible property which occurs during the POLICY PERIOD," (Mann Aff. Ex. 26 § III(m))—at the Mayo Plant at the time the Policies were issued. The Court concludes that the AEGIS Defendants have failed in their burden on the current record.

25.    First, Duke's evidence discussed above, viewed in the light most favorable to Duke, supports a conclusion that Duke did not intend to cause groundwater

---

[13] (*See* Duke's Opp'n Br. Ex. 9 Letter Division Environmental Management to Wilmington District Corps Engineers (Aug. 16, 1978), ECF No. 669.1; Duke's Opp'n Br. Ex. 13 NPDES Permit No. NC0037923 CP&L Mayo Steam Electric Plant (July 12, 1982), ECF No. 669.1.)

[14] (*See* Duke's Opp'n Br. Ex. 4 Excerpts Dep. Tr. – Charles K. Ross (Jan. 17, 2019), at 182:4–9, ECF No. 669.1; Duke's Opp'n Br. Ex. 10 Aff. Dulcie Phillips (Feb. 6, 2020) ¶¶ 11–14, ECF No. 669.1; Duke's Opp'n Br. Ex. 15 Excerpts Dep. Tr. – George Thomas Everett (Nov. 14, 2019), at 67:20–25, 69:13–22, ECF No. 669.1; Duke's Opp'n Br. Ex. 16 Aff. Charles K. Ross (Feb. 4, 2020) ¶ 5, ECF No. 669.1; Duke's Opp'n Br. Ex. 17 ¶ 4.)

contamination of any amount at the Mayo Plant at the time the Policies were issued. While the AEGIS Defendants offer evidence tending to show that Duke knew at least some groundwater contamination could be expected from its planned basin operation at Mayo, Duke's contrary evidence that it did not is sufficient to preclude summary judgment in favor of the AEGIS Defendants on the current record.

26. This same evidence also precludes summary judgment for alleged lack of fortuity. (*See* AEGIS Defs.' Supp. Br. 20–23.) In considering a first-party property insurance policy, the Supreme Court of North Carolina has recognized that "[a] loss must be fortuitous" to obtain coverage. *Avis v. Hartford Fire Ins. Co.*, 283 N.C. 142, 148, 195 S.E.2d 545, 548 (1973). The Court defined "fortuitous" as "occurring by chance without evident causal need or relation or without deliberate intention[,]" *id.* (quoting *Webster's Third New International Dictionary* 895 (1961)), and stated "[a] fortuitous event may be said to be one not certain to occur[,]" *id.* The AEGIS Defendants contend that groundwater contamination at Mayo was substantially certain to occur and thus not fortuitous, supporting summary judgment. (AEGIS Defs.' Supp. Br. 19–27.) Based on the evidence Duke has proffered, however, and assuming without deciding that the fortuity requirement applies in the context of a third-party liability policy such as those at issue on the Motion, the Court cannot conclude as a matter of law that groundwater contamination at Mayo was certain or substantially certain to occur, thereby precluding summary judgment against Duke for an alleged lack of fortuity.

27. Further, in addition to what they claim is evidence of Duke's intent, the AEGIS Defendants focus on evidence they contend shows that Duke "expected," "anticipated," "planned," or was "substantially certain" that groundwater contamination would occur at Mayo at the time the Policies were issued. (AEGIS Defs.' Supp. Br. 5–7, 21–25.) The Exclusion's plain language, however, omits these terms and is singularly focused instead on Duke's intent and whether Duke intentionally caused covered property damage. Here, that evidence is controverted, precluding summary judgment.[15]

28. Even if the Court could conclude that Duke intended some amount of groundwater contamination at Mayo, the parties' dispute over the level of groundwater contamination necessary to constitute "property damage" under the Policies is a further basis on which to deny the Motion. The AEGIS Defendants argue that any detectable amount of groundwater contamination constitutes property damage. (Tr. 17:20–18:5.) Duke disagrees, contending variously that property damage has been suffered if groundwater contamination has occurred "in the form and to the degree for which it faces liability under CAMA[,]" (Duke's Opp'n Br. 6), or where either the groundwater standard or naturally occurring constituent levels in groundwater have been exceeded, "whichever is higher[,]" (Tr. 54:9–55:9, 64:13–65:2). The evidence of record is currently insufficient to permit the Court to conclude, as the

---

[15] Much of the case law on which the AEGIS Defendants rely concerns whether an "accident" has occurred within the relevant policy's definition of an "occurrence" or whether property damage was "expected" by the insured under the policy at issue, (AEGIS Defs.' Supp. Br. 23–27)—not, as here, whether the insured intended to cause the property damage for which coverage is sought. As a result, these cases have limited persuasive force on the current Motion.

AEGIS Defendants urge, that Duke intended to cause "property damage," as defined under the Policies, requiring that the Motion be denied. Indeed, the evidence on this issue is not yet fully developed and is forecasted to be a subject of ongoing expert discovery.

IV.

CONCLUSION

29. **WHEREFORE**, the Court, for the reasons set forth above, hereby **DENIES** the Motion.[16]

**SO ORDERED**, this the 5th day of June, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[16] In light of the Court's ruling, the Court declines to reach Duke's contention that the Motion is premature under Rule 56(f) of the North Carolina Rules of Civil Procedure. (*See* Duke's Opp'n Br. 4–6.)

# APPENDIX A

## Policies at Issue on the Motion

AEGIS Defendants' Policies[17]

ACI Policy No. CC-00-26-13 (ECF No. 586.24)
Ranger Policy No. EUL 300659 (ECF No. 586.25)
Ranger Policy No. EUL 300578 (ECF No. 586.26)
AEGIS Policy No. 211 CNJ (ECF No. 586.27)
Ranger Policy No. BSP 122048 (ECF No. 586.28)

Joining Defendants' Policies

FFIC policy XLX-153 09 17[18]
U.S. Fire Policy No. 522 020271 6 (ECF No. 620.1)
PEIC Policy No. XCC 00 23 80 (Heskin Aff. Ex. 55, ECF No. 578.6)
PEIC Policy No. XCC 01 24 37 (Heskin Aff. Ex. 57, ECF No. 578.6)
Federal Policy No. (85) 7929-31-63 (Heskin Aff. Ex. 18, ECF No. 578.2)

---

[17] Although the AEGIS Defendants contend, and Duke disputes, that the ACI and Ranger policies are fronting policies for AEGIS and thus AEGIS should be the party-in-interest for those policies, this issue is not currently before the Court for decision. (AEGIS Defs.' Supp. Br. 2 n.1.; Duke's Opp'n Br. 2 n.1.)

[18] (*See* Aff. Shane R. Heskin Supp. Defs.' Opp'n Pls.' Mot. Partial Summ. J. Regarding Scope Coverage & Conditional Cross-Mot. Partial Summ. J. Regarding Allocation [hereinafter "Heskin Aff."] Ex. 19, ECF No. 578.2.)