IN THE SUPREME COURT OF NORTH CAROLINA

No. 353PA23

Filed 13 December 2024

CATO CORPORATION, a Delaware corporation, et al.

v.

ZURICH AMERICAN INSURANCE COMPANY, a New York corporation

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, No. 23-305 (N.C. Ct. App. Nov. 21, 2023) (unpublished), affirming an order entered on 10 January 2023 by Judge Forrest Donald Bridges in Superior Court, Mecklenburg County. Heard in the Supreme Court on 22 October 2024.

*Robinson, Bradshaw & Hinson, P.A., by Matthew W. Sawchak, R. Steven DeGeorge, and Benjamin C. DeCelle; and Kozyak Tropin & Throckmorton LLP, by Benjamin J. Widlanski, pro hac vice, Dwayne A. Robinson, pro hac vice, and Gail A. McQuilkin, pro hac vice, for plaintiff-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Gary S. Parsons and Kimberly M. Marston; Squire Patton Boggs (US) LLP, by Lauren S. Kuley, pro hac vice; and Teague Campbell Dennis & Gorham LLP, by William A. Bulfer, Megan N. Silver, and Daniel T. Strong, for defendant-appellee.*

EARLS, Justice.

This is a companion case to *North State Deli, LLC v. Cincinnati Insurance Co.*, No. 225PA21-2 (N.C. Dec. 13, 2024), also announced today. There, we held that restaurant policyholders stated a claim for insurance coverage when COVID-19-related government orders caused the restaurants to suspend business operations

due to the loss of use of and access to the restaurants' physical property. Such losses amounted to a "direct physical loss" under the terms of that policy, we concluded. We specifically declined to define "direct physical loss" as requiring tangible alteration of property. Here, we address a related issue: whether a clothing store retailer stated a claim for insurance coverage when it alleged that COVID-19 transformed and destroyed its property but where the policy excludes viral contamination as a covered cause of loss.

The plaintiff here, Cato Corporation, is a clothing retailer with more than 1,300 stores across North Carolina and thirty-six other states. In July 2019, it purchased an "all-risk" commercial property insurance policy from defendant Zurich American Insurance Company. That insurance policy was operative in the spring of 2020 when, as Cato alleged in its complaint, the COVID-19 virus and related government orders forced the retailer to "close, severely curtail operations, and remediate and reconfigure their spaces." Zurich refused to cover those alleged losses, and Cato sued. Among other claims, Cato sought a declaratory judgment that its policy with Zurich covered its alleged losses. The trial court dismissed Cato's claims on a Rule 12(b)(6) motion, and the Court of Appeals affirmed—both relying on the now-reversed Court of Appeals decision in *North State Deli, LLC v. Cincinnati Ins. Co.*, 284 N.C. App. 330 (2022).

On review, we agree with the Court of Appeals' ultimate decision to affirm the dismissal of Cato's claims. But we disagree with the Court of Appeals' reasoning.

Under *North State Deli*, No. 225PA21-2, we conclude that Cato failed to allege facts sufficient to state a claim for insurance coverage due to direct physical loss of or damage to property because the contamination exclusion precludes coverage for direct physical losses caused by viruses. Therefore, we affirm the Court of Appeals' judgment.

## I.    Background

In reviewing a trial court's grant of a Rule 12(b)(6) motion, we examine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 572 (2021) (quoting *Bridges v. Parrish*, 366 N.C. 539, 541 (2013)). The summary below follows from the factual allegations in Cato's complaint and subsequent judicial proceedings.

## A. Cato purchases an "all-risk" commercial property insurance policy from Zurich.

In July 2019, Cato purchased an "all-risk" commercial property insurance policy from Zurich American Insurance Company. That policy provides $250 million in coverage for the benefit of Cato and its named subsidiaries in exchange for substantial premiums. A copy of the policy was attached as an exhibit to Cato's initial complaint and incorporated therein by reference.

Like the policy at issue in *North State Deli*, No. 225PA21-2, Cato's policy is an "all-risk" commercial property insurance policy. That means the policy defines the scope of covered risks by its exclusions. *See N. State Deli*, No. 225PA21-2, slip op. at

5–7. Section 1.01 of the policy reads, "This Policy Insures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location . . . all subject to the terms, conditions and exclusions stated in this Policy." The bold lettering connotes a defined policy term. In turn, Covered Cause of Loss is defined as "All risks of direct physical loss of or damage from any cause unless excluded." The policy does not define "direct physical loss of or damage," or any constituent term in that phrase.

One such excluded risk is "contamination." Specifically, the policy excludes "**Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy." In turn, "contamination" means "any condition of property due to the actual presence of any . . . virus."

The policy also provides coverage for lost business income due to direct physical loss of or damage to property. Specifically, under the "time element" coverage provision, Zurich must pay for

> the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the insured's business activities at an Insured Location. The **Suspension** must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than **Finished Stock**) caused by a **Covered Cause of Loss** at the **Location** . . . .

This insurance contract was in effect when the pandemic struck in the spring of 2020.

**B. Cato alleges that the COVID-19 virus caused "direct physical loss of or damage" to property.**

As Cato alleges, beginning in March 2020, the COVID-19 virus "physically inundated" Cato's stores.[1] The virus's "physical impacts . . . damaged [Cato's] properties" and rendered them "uninhabitable, unfit, unsafe and unusable." Government orders forced Cato's stores to close and set limits and conditions on how they could later reopen. Cato had to "remediate and reconfigure" its physical spaces "because of the pervasiveness of the COVID Virus, including its direct physical impacts on property." Cato incurred significant revenue losses because of the virus's impairment of its property and related government mandates. It also incurred great expense in attempting to remove the virus "and otherwise remediate, reconfigure and restore the physical damage to its properties," including by altering "the physical structures to comply with governmental safety guidelines and best practices."

Cato sought coverage for losses sustained due to the virus's impairment of the safety, use, and functionality of its stores in March of 2020. Zurich neither affirmed nor denied coverage for Cato's claim, instead issuing a reservation of rights letter pointing to various policy provisions. Cato then sued before the expiration of the one-year contractual limit, seeking a declaratory judgment that its losses were covered under its policy with Zurich, and requesting damages for breach of contract as well as treble damages and attorneys' fees for violations of North Carolina's Unfair and

---

[1] Consistent with Cato's complaint, we use "COVID-19 virus" in this opinion to refer to the SARS-CoV-2 virus which causes the COVID-19 respiratory illness.

Deceptive Trade Practices Act.

## C. Court of Appeals affirms dismissal of Cato's claims.

Zurich moved to dismiss all of Cato's claims under North Carolina Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See* N.C.G.S. § 1A-1, Rule 12(b)(6) (2023). After a hearing, the trial court concluded that the decision of the Court of Appeals in *North State Deli*, 284 N.C. App. 330, was "authoritative and warrants dismissal" of Cato's claims. In particular, it observed that "in order for a loss to be covered by the policy, the loss must have resulted from physical harm to the property of the insured." Cato's allegations that the COVID-19 virus physically damaged the covered property were "not sufficient to overcome" that caselaw.

Cato appealed, and on review, the Court of Appeals held that "tangible alteration to the property is necessary to" recover for a "direct physical loss of or damage" to property. *Cato Corp. v. Zurich Am. Ins. Co.*, No. 23-305, slip op. at 9 (N.C. Ct. App. Nov. 21, 2023) (unpublished). Cato failed to allege such losses in its complaint, the court concluded, because "the record does not indicate any 'physical transformation' of plaintiffs' property." *Id.* at 10 (citing *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 883 (S.D.W. Va. 2020), *aff'd*, 27 F.4th 926 (4th Cir. 2022)). Although Cato alleged that the virus causes "tangible physical transformation of the air and surfaces" of its property, "adhered to all objects and surfaces" in the property, and "transformed Covered Properties into dangerous vectors of illness and disease . . . requir[ing] ongoing remediation," *id.* at 9–10, those

allegations were, in the view of the Court of Appeals, "unwarranted deductions of fact" not entitled to the presumption of truth at the motion to dismiss stage, *id.* at 10 (quoting *Sutton v. Duke*, 277 N.C. 94, 98 (1970)). The Court of Appeals did not reach the issue of whether coverage was barred by a policy exclusion, reasoning that an insurer has no burden to prove a policy exclusion until a prima facie case of coverage is shown. *Id.* at 14 (citing *Fortune Ins. Co. v. Owens*, 351 N.C. 424, 430 (2000)). The Court of Appeals affirmed the trial court's order dismissing Cato's complaint, and Cato again appealed. We allowed Cato's petition for discretionary review on 21 May 2024.

## II. Analysis

We conclude that Cato sufficiently alleged a "direct physical loss of or damage" to property under the approach we articulated in *North State Deli*, No. 225PA21-2. However, Zurich met its burden to prove the contamination exclusion applies, and therefore, Cato's claims were properly dismissed. We address each issue in turn.

### A. Standard of review.

North Carolina is a notice pleading state, meaning that a complaint need only give "sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand its nature and basis and to file a responsive pleading." *Pyco Supply Co. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 442 (1988); *see also* N.C.G.S. § 1A-1, Rule 8(a)(1) (2023). It is not appropriate to dismiss a complaint unless "it appears to a certainty that [the] plaintiff is entitled to no relief under any

state of facts which could be proved in support of the claim." *Est. of Graham v. Lambert*, 385 N.C. 644, 656 (2024) (quoting *Sutton*, 277 N.C. at 103).

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim. *Id*. The motion is properly granted "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint on its face reveals the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim." *Jackson v. Bumgardner*, 318 N.C. 172, 175 (1986). On a Rule 12(b)(6) motion, well-pleaded allegations of fact in the complaint are treated as true, but conclusions of law are not. *Id*. at 174–75. Factual inferences should be viewed "in the light most favorable to the nonmoving party." *See CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016) (quoting *Daniels v. Montgomery Mut. Ins. Co.*, 320 N.C. 669, 682 (1987)).

"Questions concerning the meaning of contractual provisions in an insurance policy are reviewed *de novo* on appeal." *Register v. White*, 358 N.C. 691, 693 (2004). As we explained in *North State Deli*, when interpreting a contract for insurance, the plain language and ordinary meaning of the policy control unless the contract specifically defines certain terms or the context suggests otherwise. No. 225PA21-2, slip op. at 11–12. The contract "should be given that construction which a reasonable person in the position of the insured would have understood it to mean." *Id*. at 12 (quoting *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43 (1978)). Where the language of a contract is reasonably susceptible to either construction offered by the parties, the

ambiguity should be construed in the policyholder's favor. *Id.* at 12–14 (citing *Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295 (2020)).

**B. Cato's complaint sufficiently alleged a "direct physical loss of or damage" to property.**

*North State Deli*, No. 225PA21-2, controls here on the question of whether, absent an exclusion, the policy covers this loss. Applying that precedent, Cato did sufficiently allege a "direct physical loss of or damage" to property.

The parts of Cato's policy that grant coverage are functionally the same as the parts of North State Deli's policy that grant coverage. Both policies rely on the operative phrase "direct physical loss" without defining that term, so it must be given its ordinary meaning. *Id.* at 14–15; *see also Accardi*, 373 N.C. at 295. Both make use of the conjunctive "or," as in the phrase "direct physical loss of or damage" to property, so direct physical loss must have a distinct and possibly broader meaning than physical damage in order to give effect to both phrases. *See N. State Deli*, No. 225PA21-2, slip op. at 16–17; *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133, 142 (1990). And both contain a set of exclusions that suggest a broader meaning of "direct physical loss" of property. *See N. State Deli*, No. 225PA21-2, slip op. at 19. Here, for example, Cato's policy excludes unexplained disappearances, seizure or other governmental destruction, the cumulative effects of dust, and "delay, loss of market, or loss of use." Those exclusions suggest the scope of "direct physical loss" of property is broader than physical tangible alteration to property, or else they need not be mentioned as exclusions to begin with.

In its complaint, Cato alleged specific facts to show that "The COVID Virus caused tangible physical transformation of the air and surfaces at the Cato's Covered Properties [sic], and rendered them dangerous transmission sources for the COVID Virus, making the Covered Properties unsafe, unfit, non-functional and uninhabitable for their intended uses." That physical destruction, "along with the government orders that recognized these physical effects, shuttered Cato's Covered Properties and caused physical loss of Cato's use of the Covered Properties."

Thus, accepting these factual allegations as true and taking factual inferences in the light most favorable to the nonmoving party, as we must at the motion to dismiss stage, Cato met its burden to show coverage due to a "direct physical loss of or damage" to property. *See Jackson*, 318 N.C. at 174–75; *CommScope Credit Union*, 369 N.C. at 51.

**C. The contamination exclusion applies to Cato's alleged losses.**

Once a prima facie case of coverage is shown, the insurer has the burden to prove a policy exclusion precludes coverage. *See Fortune Ins. Co.*, 351 N.C. at 430. We conclude that Zurich has met its burden here and that the contamination exclusion in Cato's policy precludes coverage for Cato's alleged losses.

To assess whether any exclusion applies, we review the full text of Cato's policy. Such a review is appropriate at the motion to dismiss stage without converting the motion to one for summary judgment, because the policy was attached as an exhibit to Cato's initial complaint and explicitly incorporated therein. *See* N.C.G.S.

§ 1A-1, Rule 12(b) (2023). One part of the policy explicitly excludes coverage for losses resulting from "contamination." Specifically, contamination and "any cost" associated with it, "including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy" is excluded by the policy. In turn, "contamination" is defined as "[a]ny condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent, Fungus, mold or mildew." (Emphasis in original omitted; italicized emphasis added.)

Viral contamination is essentially what Cato alleges. It alleges that the COVID-19 virus's "physical transformation of the air and surfaces" rendered its properties "dangerous transmission sources" and made them unsafe and non-functional for their intended uses. "[B]ecause of the pervasiveness of the COVID Virus," Cato's stores "were compelled by government orders to close, severely curtail operations, and remediate and reconfigure their spaces." A "reasonable person in the position of the insured," see *Grant*, 295 N.C. at 43, would understand such allegations to qualify as "condition[s] of property due to the actual presence of any . . . virus."[2]

---

[2] Cato seems to concede as much in its brief to this Court, when it explained in a footnote how the virus physically damages surfaces: "When *contaminated* with the Covid Virus or another infectious organism, . . . the surface or object to which the virus or organism adheres is transformed into a 'fomite.'" (Emphasis added.)

Cato responds that this is not the operative definition of "contamination" or "contaminant" in its policy. Instead, it says that it alleged it paid a higher premium for a different definition of "contamination." That revised definition is located in a series of "amendatory endorsements" at the end of the policy, which appear with labels corresponding to specific states—thirty-one states, in fact. Cato argues that the "Amendatory Endorsement – Louisiana" policy provision amended Cato's coverage by deleting the definition of "contamination" listed in the main body of the policy and described above, replacing it with one that excludes viruses. Thus, it contends, viral contamination is covered.

Cato's argument that its North Carolina policy incorporates the Louisiana amendatory endorsement is unpersuasive. To start, Cato's complaint does not allege, as a factual matter, that it bargained for the Louisiana endorsement to apply to its policy covering properties not in Louisiana. The complaint makes a general allegation that not having a *virus exclusion* in an "all-risk" policy means Cato paid a higher premium for virus coverage. It specifically defines that *virus exclusion* as a standalone "Exclusion Of Loss Due To Virus or Bacteria" that it alleges is "contained in most of [Zurich's] other all risks property insurance policies."[3] Then, in a footnote, the complaint alleges that the separate *contamination exclusion* does not preclude coverage for Cato's losses. But it does not explain why. Nor does it argue that it has

---

[3] That separate virus exclusion allegedly states that Zurich "will not pay for loss or damage caused by or resulting from any virus."

any stores or properties in Louisiana. Absent such factual allegations, the effect of the endorsement as it appears in the policy is a question of law not entitled to a presumption of truth. *See Register*, 358 N.C. at 693.

Relying then on the insurance contract itself, Cato alternatively argues that the thirty-one state-specific amendatory endorsements contain contradictions and should therefore be strictly construed in Cato's favor. It points out that two of the thirty-one state-labeled amendatory endorsements (Connecticut and New York) specify that the endorsement "**APPLIES TO THOSE RISKS IN** [state name]." The twenty-nine other amendatory endorsements omit such limiting language, including the one labeled "Louisiana." The Louisiana amendatory endorsement also proclaims: "**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**"

Certainly the amendatory endorsements would be clearer if each specified that it applied to risks only in the state corresponding to its label. But that something could be written more clearly does not necessarily make it ambiguous; rather, an ambiguity exists in an insurance contract when its language is "fairly and reasonably susceptible to either of the constructions for which the parties contend." *See Accardi*, 373 N.C. at 295. We think these labels are reasonably susceptible to only one construction: a "reasonable person in the position of the insured" would construe an "Amendatory Endorsement – Louisiana" in the context of thirty other state-specific amendatory endorsements as having some connection to risks or losses only in

Louisiana. *See Grant*, 295 N.C. at 43. Thus, it is not applicable here, where Cato does not allege any connection to Louisiana.

This reading also comports with the other interpretive principle that insurance policy provisions should be read in harmony and not to create conflicts. *See C.D. Spangler Constr. Co.*, 326 N.C. at 142. If we look only at the state-specific amendatory endorsements that do *not* have language limiting them to risks in those states (i.e., the twenty-nine other endorsements outside of Connecticut and New York), and read those to affect policies in all states, conflicts abound. For example, the Georgia amendatory endorsement requires legal action to be initiated within twenty-four months of the date of the loss, while Maryland states three years, and Missouri states ten years. The Alaska amendatory endorsement states that if the insured cancels, the refund may be subject to a cancellation fee of 7.5% of any unearned premium, while the Florida amendatory endorsement does not mention a cancellation fee and instead provides that "the refund may be less than pro rata but no less than 90% of the pro rata unearned premium." Those two amendatory endorsements also specify different timelines by which a refund is to be mailed. Alaska states any premium refund will be mailed within forty-five days after the request for cancellation; Florida states any premium refund will be mailed within fifteen days of the cancellation taking effect. Reading the state-specific amendatory endorsements to apply only to those risks in the respective states avoids these conflicts and harmonizes the provisions consistent with the parties' intent. *See C.D. Spangler Constr. Co.*, 326 N.C. at 142.

Cato makes the final point that a different provision of the policy instructs that "The titles of the various paragraphs *and endorsements* are solely for reference and shall not in any way affect the provisions to which they relate." (Emphasis added.) This limitation must mean that the "Amendatory Endorsement – Louisiana" provision cannot be read in a manner that affects the scope of Cato's coverage, it asserts. But if that were right, the titles of each endorsement would become superfluous. That again contradicts our obligation to give effect to each policy provision. *See C.D. Spangler Constr. Co.,* 326 N.C. at 142. The more harmonious reading is that the titles do serve as a reference to understand *where* coverage applies, but do not change the underlying substance of the applicable policy.

In sum, a "reasonable person in the position of the insured" would understand the viral contamination exclusion in Cato's policy to exclude Cato's alleged losses. *See Grant*, 295 N.C. at 43. That exclusion bars coverage for Cato's alleged losses here.

### III.    Conclusion

For the foregoing reasons, we conclude that Cato's alleged losses are barred by the viral contamination exclusion in its commercial property insurance policy with Zurich. We modify the Court of Appeals decision below but affirm its judgment dismissing Cato's claims.

MODIFIED AND AFFIRMED.